UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| BILL SHANNON WILSON, | ) | |
| | ) | Case No. 3:19-cv-299 |
| *Petitioner*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Debra C. Poplin |
| BERT BOYD, | ) | |
| | ) | |
| *Respondent*. | ) | |

**MEMORANDUM OPINION**

After Petitioner's great niece accused him of raping her on two occasions when she was eleven years old, a Campbell County jury convicted Petitioner of two counts of rape of a child. *State v. Wilson*, No. E2013-02551-CCA-R3-CD, 2014 ZWL4639504, at *1–2 (Tenn. Crim. App. Sept. 18, 2014), *perm. app. denied* (Tenn. Sept. 18, 2014) ("*Wilson I*"). Petitioner, a state prisoner, has filed a pro se petition for habeas corpus relief pursuant to 28 U.S.C. § 2254 challenging these convictions by asserting that his trial counsel provided ineffective assistance [Doc. 1]. Respondent filed a response in opposition to the petition [Doc. 12] and the state-court record [Doc. 11], and Petitioner filed a reply [Doc. 13]. After Respondent construed Petitioner's reply to assert new claims, Respondent filed a motion to file a sur-reply [Doc. 15], which the Court granted [Doc. 20]. Respondent then filed his sur-reply [Doc. 21], and Petitioner filed a sur-sur-reply in which he asserts for the first time a claim for actual innocence [Doc. 22]. Petitioner then filed two affidavits to support his actual-innocence claim [Doc. 25, at 3; Doc. 27, at 4].

1

After reviewing the parties' filings and the state-court record, the Court finds that Petitioner is not entitled to relief under § 2254 and no evidentiary hearing is warranted. *See* Rules Governing § 2254 Cases, Rule 8(a); *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). Accordingly, the habeas corpus petition will be **DENIED**, and this action will be **DISMISSED**.

## I.    BACKGROUND

After the jury convicted Petitioner of two counts of rape of a child, he filed a direct appeal asserting that his trial court erred in:  (1) denying his motion for judgment of acquittal; (2) denying his motion for a new trial due to newly discovered evidence and the insufficiency of the indictment; and (3) admitting certain testimony from a rebuttal witness [Doc. 11-8].  The Tennessee Court of Criminal Appeals ("TCCA") described the evidence from Petitioner's trial as follows:

> The victim testified that she was sixteen years old at the time of trial and in her junior year of high school.  The victim stated that [Petitioner], whom she had known her whole life, was married to her great aunt.  She related that she spent time with [Petitioner] during holiday celebrations, and that she and her older sister, P.S., would "stay the night" at his home.
>
> The victim testified that her birthday is at the end of June.  After school had finished in mid-May, but before her twelfth birthday in June of 200[6],[1] she spent the day at [Petitioner]'s and her great aunt's house.  That night, she, P.S., and [Petitioner] "went to go ride the four-wheelers around the block."  She explained that [Petitioner] had two four-wheelers, a green one and a blue one.  The blue four-wheeler was larger than the green, so she rode on the blue four-wheeler seated behind [Petitioner] while P.S. drove the green four-wheeler.  At some point, [Petitioner] and the victim became separated from P.S.  She described the area saying, "there was a road that went—you could go straight or you could follow the road and you can turn the curve."  This gravel road, "like a little driveway," led down to an area where there was a "big thing of concrete."  She identified photographs of the area.  One of the pictures depicted a dirt path that the victim said was "basically a four-wheeler trail going down to it, basically a faster way to get down there."

---

[1] While the TCCA twice stated in its opinion that this event occurred in 2007, *Wilson I*, at *1–2, the record as a whole establishes that it occurred in 2006 [Doc. 11-2, at 46–48, 129–30], so the Court has corrected the relevant date references in the TCCA's opinion.

The victim testified that [Petitioner] drove down the side road that led into a wooded area where "the house used to be" and parked the four-wheeler, "facing back towards the roadway." The victim said that she was familiar with the area because she and her sister had driven the four-wheelers down to this area before. She said that this concrete slab was close to [Petitioner]'s house. The victim said that P.S. had continued on the main road explaining that [Petitioner] "sped up" leaving P.S. "quite a ways" behind them.

The victim testified that, after [Petitioner] parked the four-wheeler, he told her that they were "gonna sit down here and talk for a minute." She said that she was seated "sideways" on the four-wheeler while [Petitioner] was standing. [Petitioner] touched her knees but "it didn't really bother [her]." She said they talked for a few minutes and then, "[Petitioner] got mad, I guess, and then he just kind of slammed me down on it." [Petitioner] retrieved two bungee cords from the rear of the four-wheeler and tied the victim's wrists to the handlebars of the four-wheeler. The victim described in detail the bungee cords for the jury. He then pulled the victim's jeans and underwear off and positioned himself over the victim and penetrated the victim's vagina and "started moving." She described his penetration as painful. When he finished, [Petitioner] told the victim that if she said "anything," he knew where she lived. She said that she initially thought this was a threat but as she thought about it she "wasn't sure how exactly to take that."

The victim testified that [Petitioner] untied her, threw her clothes at her, and told her to get dressed. The victim said that she didn't say anything to [Petitioner], "the first time." She explained that, a few weeks later, but still before her twelfth birthday in June 200[6], her mother needed to "take [her] papaw to Murfreesboro," so her mother asked [Petitioner] if the victim could stay with him while she was away. The victim said that she had not had any contact with [Petitioner] since the earlier incident. When she learned he was coming to get her, she said she did not "freak out or anything" because she believed it would not happen again. She stated that, at this time, she had not told anyone about the incident because she "felt dirty" and "shameful" like "it was [her] fault."

The victim testified that [Petitioner] picked up the victim at her home in a "little black Chevrolet truck." On the way to [Petitioner]'s house, he pulled into the same area where the "house had been." She said that the two sat in the truck talking. When they stopped talking, [Petitioner] leaned over her with one arm on the console and his other arm on the passenger side armrest with his face directly in front of hers and then leaned back over into his seat. She said that [Petitioner] sat in his seat with his arm still on the console "for a minute or so" and then reached over, unbuttoned her pants, and put his hand down her pants and placed one of his fingers inside of her vagina. The prosecutor asked the victim how she felt when [Petitioner] did this and the victim replied, "I just felt like—you know, I thought what—what honestly am I doing so wrong." She said [Petitioner] moved

3

his finger "in and out" of her vagina and that it hurt "[a] little." When [Petitioner] stopped, the victim looked at him and asked "why are you doing this to me[?]" She said that [Petitioner] just looked at her and then drove to the house.

The victim testified that she spent that night at her great aunt's and [Petitioner]'s house as her mother had planned and that nothing else occurred during her stay. She stated that there had been no sexual contact between her and [Petitioner] since the incident in the pickup truck. She said that she did not tell her parents immediately because she was afraid that they would be ashamed of her. She said she felt like "it was [her] fault," and she would be blamed for the incidents. She stated that, when she was thirteen years old, she told a friend, Tiffany Hatfield, about the first incident but that the two girls lost contact with one another. Later she recalled seeing a television commercial for "Safe Haven" so she "called, and [she] told a lady about it." When the woman she spoke with on the telephone told her the incidents would have to be reported, the victim said she was ready to report it because she did not "want to live with it on [her] conscience every day." The victim stated that she made this telephone call to Safe Haven in October 2009.

The victim testified that the woman she spoke with on the telephone came to see her the following day and stayed with her while she told her parents. She said that she struggled with telling her family and explained that the impact has been "hard for everybody." She agreed that she had spoken with detectives about the incidents but that she had not told her sister, P.S., "a whole lot about it."

On cross-examination, the victim maintained she had previously been to the location where [Petitioner] took her on those two occasions despite her testimony at the preliminary hearing that she had not been there before. The victim said that she did not recall telling Jami Hall and Malea Henegar that, after the first incident and before the second incident, [Petitioner] called her "several times" threatening to climb through her window and kill her if she told anyone. She also stated that she did not remember telling Ms. Hall that [Petitioner] called her a "dirty whore" or that P.S. was the first person she told about the incidents when she was thirteen. The victim maintained that she told P.S. after the DCS worker came to her home and she had told her parents. The victim said she did not remember telling Ms. Hall that [Petitioner] took her home after the first incident because she would not quit crying and that her mother was home at the time and asleep. The victim maintained that she spent the night at [Petitioner]'s residence after the first incident.

Tiffany Hatfield testified that she lived across the street from the victim when the victim was in elementary school. Ms. Hatfield said that she and victim saw each other on a daily basis until the victim told her "something . . . about her being hurt." Ms. Hatfield explained that she had been in "a similar situation" and that, because of this experience, she "couldn't face [the victim] or her mother." She said that the victim was thirteen years old at the time she disclosed the

4

information to Ms. Hatfield and that she had not told anyone what the victim told her because she did not think it was her "place."

Jami Hall, a Campbell County Sheriff's office detective, testified that in January 2010 she accompanied a DCS employee to a high school to interview a fifteen-year old female, the victim. She said that the case was initially reported in October 2009. She also interviewed [Petitioner], who denied all allegations, approximately a week after the interview with the victim. [Petitioner] did admit to owning two four-wheelers and riding one of the four-wheelers with the victim. Detective Hall also confirmed that [Petitioner] drove a black "S–10" pickup truck. Detective Hall said that the victim described the location of the incidents and that [Petitioner] told her that the area was a residence that had burned down. Based upon this information she obtained the address through the "911 center" and went out to the location to take photographs.

Detective Hall testified about the warrant in this case. The warrant reflected the year 2005 as when the event occurred. Detective Hall said that the victim never provided an actual year when the events occurred; however, she kept reiterating that she was eleven years old at the time and turning twelve at the end of June. While preparing the warrant, Detective Hall said that she was focused on the victim's being eleven so she wrote down 2005, the year the victim turned eleven, rather than the year 2006 when the victim was eleven and turning twelve.

On cross-examination, Detective Hall testified that she presented the year of the alleged rapes incorrectly as 2005, rather than 2006, to the grand jury as she had in the warrant. Detective Hall agreed that some of the victim's testimony at trial was different than what she had told Detective Hall on January 28, 2010. She said that during the January 28, 2010 interview, the victim told her that [Petitioner] took her home after the first incident. Detective Hall agreed that the victim did not tell her during the January 28, 2010 interview that she had told Tiffany Hatfield about the incidents, but the victim said later that she had told Ms. Hatfield. Detective Hall recalled that the victim had told her that there were two to three weeks between the two incidents and that [Petitioner] called her during this time to apologize. Detective Hall also agreed that the victim told her that [Petitioner]'s wife had had a hysterectomy and requested the victim come stay with her. Detective Hall said she did not speak with [Petitioner]'s wife to confirm the date of the hysterectomy. Detective Hall confirmed that the victim told her that [Petitioner] had called the victim several times to threaten to climb through her window and kill her. The victim had also said that [Petitioner] called her "a dirty whore." Detective Hall agreed that the victim did not testify at trial about those statements by [Petitioner]. Detective Hall testified that she had spoken with the victim four or five times since the January interview and that the victim had changed some of the "time frame details" or what happened before or after the incidents but that she was consistent as to the specific details of the incidents.

On redirect examination, Detective Hall stated that, in her experience, it was common for witnesses to forget some of the details of a case. Detective Hall stated that the victim's account of the specific details of where the incidents occurred, how old the victim was at the time, and what exactly had happened at that location had not changed.

The State announced the conclusion of its case-in-chief and [Petitioner] made a motion for a judgment of acquittal as to both counts based upon the victim's inconsistent testimony. The trial court overruled [Petitioner]'s motion.

P. S., the victim's sister who was nineteen years old at the time of trial, testified for [Petitioner] that the victim had never told her about the two incidents. P.S. denied that she and the victim "periodically" went to [Petitioner]'s house or that there was ever a time that the three of them were four-wheeling and [Petitioner] pulled off the road and disappeared. P.S. said that the victim had stated on several occasions that she wanted to be on the Maury Povich show some day.

On cross-examination, P.S. stated that she would go over to [Petitioner]'s house but that the victim would not go "unless she actually—absolutely had to." She maintained that she, the victim, and [Petitioner] never rode four-wheelers together. She explained that it was always she and the victim who rode on a four-wheeler together. She stated that she had been "by [the victim's] side" every time she had been around [Petitioner] "for the whole time she's been alive." P.S. agreed that she was testifying because [Petitioner], along with other family members, had offered to financially help her go to Mexico to be with her boyfriend who was deported. P.S. denied that she had ever been drunk "around" [Petitioner] or that [Petitioner] had ever stayed at the house with her and her mother.

The State called S.B., the victim's mother, as a rebuttal witness. S.B. confirmed that [Petitioner] had stayed at her house. S.B. explained that, one morning when she got up at 5:30 a.m. to go to work, she saw [Petitioner]'s truck parked in her driveway. She looked for [Petitioner] and found him in P.S.'s room. She stated that she was aware of five or six occasions on which P.S. has been drunk or used alcohol "around" [Petitioner]. S.B. stated that P.S. was also "drunk on a boat" with [Petitioner] when she was twelve years old.

*Wilson I*, at *1–5. The TCCA affirmed the trial court's judgments, and the Tennessee Supreme Court ("TSC") denied review. *See id*.

Petitioner then filed a pro se petition for post-conviction relief asserting claims that his trial counsel was ineffective for: (1) failing to properly prepare for trial and investigate the victim's allegations; (2) failing to call various witnesses, including Judy Wilson and Raymond

Smith; and (3) failing to call Petitioner to testify, among other claims [Doc. 11-15, at 3–46].

Petitioner's appointed counsel later filed an amended petition for post-conviction relief that did

not incorporate the pro se petition but included claims that his trial counsel was ineffective for:

(1) not properly investigating the case prior to trial; (2) failing to interview or cross-examine

Tiffany Hatfield; and (3) having a conflict of interest due to concurrent representation of Melia

Henegar,[2] among other claims [*Id.* at 83–89]. The state filed a response to both the pro se

petition for post-conviction relief and the amended post-conviction petition [*Id.* at 91–95]. After

holding a hearing [Doc. 11-17], the post-conviction court denied the petition, specifically stating

that it heard the case based on both the original petition for post-conviction and the amendments

thereto, as well as the state's responsive pleadings, and found no merit to any of Petitioner's

claims [Doc. 11-15, at 97].

      Petitioner appealed this denial to the TCCA, which summarized Petitioner's post-

conviction proceedings as follows:

> In his timely-filed petition for post-conviction relief, the petitioner claimed,
> among other things, that he was deprived of the effective assistance of counsel
> due to his counsel's failure to fully investigate the case, failure to challenge the
> specificity of the indictment, and failure to call certain witnesses, including the
> petitioner. In an amended petition for post-conviction relief filed by post-
> conviction counsel, the petitioner added claims that his counsel performed
> deficiently by failing to call a certain witness to impeach the victim's testimony,
> failing to file certain pre-trial motions, failing to seek "a forensic psychological
> evaluation and/or psycho-sexual evaluation of [the p]etitioner or victim," failing
> to seek a bill of particulars, failing to disclose a conflict of interests, failing to
> object during the State's cross-examination of the defense witness, and failing to
> communicate a plea offer. The petitioner exhibited to his petition his motion for
> new trial, exhibited to which was an affidavit from Ms. Hatfield in which she
> expressed doubts about the truth of the victim's allegations.

---

[2] Both the trial court reporter and the TCCA spelled this individual's name as "Malea Henegar."
However, as the divorce complaint that was filed as an exhibit to the post-conviction hearing
spells this individual's name "Melia Jordan Henegar" [Doc. 11-16, at 5], that is how the Court
spells her name.

At the August 2017 evidentiary hearing, second-chair trial counsel ("co-counsel") testified that he was neither retained nor appointed to represent the petitioner but was instead employed by the petitioner's first-chair trial counsel ("trial counsel") at the "last minute" to assist at the petitioner's trial. Co-counsel met with the petitioner prior to trial along with trial counsel and the petitioner's family. Co-counsel confirmed that he represented Malea Heneger, later identified as the DCS investigator in the petitioner's case, in her divorce proceedings, which representation was contemporaneous with the petitioner's pretrial and trial proceedings.

Upon questioning by the court, co-counsel agreed that a second-chair attorney is bound by the same ethical standards as a first-chair attorney. He acknowledged that he failed to obtain written consent from the petitioner waiving any conflict of interests, but stated that he informed the petitioner of the conflict "[b]efore trial." Trial counsel informed the petitioner of the risk of the contemporaneous representation of the petitioner and Ms. Henegar and offered the petitioner the option to "get new counsel" or have co-counsel excluded. Co-counsel testified that he did not discuss the petitioner's case with Ms. Henegar, stating, "She wasn't my witness. And right before trial was the only time that I met with [the petitioner], and I didn't even know I was gonna be part of the trial. She wasn't my witness at trial."

The petitioner testified that he retained trial counsel to represent him in this case because the petitioner had only a seventh grade education, could not read or write well, and "didn't have any knowledge of the law." He stated that trial counsel told him that the State had "no evidence" to support the charges against him. Trial counsel appeared on the petitioner's behalf at the preliminary hearing, but the petitioner claimed that trial counsel did "not really" remain in contact with him thereafter. The petitioner said that he met with trial counsel only two or three times before trial, that one of those meetings was the day before trial, and that the only thing that occurred during their final meeting was that trial counsel instructed him to obtain medical records for his wife, Judy Wilson's, 2004 hysterectomy without explaining the significance of the medical records to the case. The petitioner recalled that on one occasion, trial counsel accompanied him to the scene of the alleged rapes, and trial counsel took photographs.

The petitioner averred that trial counsel never discussed a defense strategy with him. The petitioner said that he identified his wife and brother-in-law as potential witnesses, but trial counsel did not call any witnesses on the petitioner's behalf. The petitioner acknowledged that trial counsel talked with Lisa Smith and Patricia Smith before trial, but trial counsel did not call them to testify. The petitioner was unaware of any attempt by trial counsel to interview the State's witnesses. He claimed that Ms. Hatfield attempted to contact trial counsel, but trial counsel never returned her calls. Trial counsel did not cross-examine Ms. Hatfield at trial.

The petitioner testified that trial counsel never discussed with him whether the petitioner would testify or the risks and benefits of doing so. He recalled that "right before trial started," after the judge explained that the petitioner had a right to testify, trial counsel told him to "turn around there and tell the [j]udge you won't be testifying." The petitioner said that he did not know whether he would be called to testify until trial counsel told him that he "won't be testifying." The petitioner stated that trial counsel did not prepare him to testify.

The petitioner said that co-counsel was not present during any pre-trial meetings with trial counsel, but the day before trial, trial counsel told the petitioner that co-counsel "was representing Malea Henegar in a nasty divorce." The petitioner stated that he was unaware at the time that co-counsel would be participating in his trial and that trial counsel did not explain how co-counsel's representation of Ms. Henegar could affect his case. The petitioner claimed that he was not informed that he had the option of obtaining a different lawyer after learning of the conflict of interests. The petitioner never signed a written waiver of the conflict. The petitioner contended that he was unaware that co-counsel was going to participate in his case until co-counsel sat at the defense table at trial. The petitioner said that he "was trying to see what we were gonna do because . . . there had been nothing discussed with [him]," and co-counsel told him "it's your rodeo[;] you can do whatever you want to."

The petitioner asserted that trial counsel never discussed whether the State offered a plea agreement. Trial counsel did not explain to the petitioner the risks and benefits of taking the case to trial, and the petitioner said that he did not understand the risks of going to trial. The petitioner asserted that trial counsel made all of the decisions in the case. As an example, the petitioner stated that, before his sentencing hearing, trial counsel "just told [him] that's what [the sentence] was gonna be." The petitioner said that, other than the one trip to the crime scene, trial counsel conducted no investigation and, as a result, was unprepared for trial. The petitioner stated, "I don't feel like [trial counsel] done the job that he should have done for me far as doing his investigation and . . . talking to the people that he did talk to that could have and would have been witnesses on my behalf . . . ."

On cross-examination, the petitioner stated that, had he known co-counsel would be participating in his case "and had been told certain things there, [he] probably wouldn't have had him" at trial. The petitioner did not recall being questioned about trial counsel's having discussed with him whether or not he would testify. He stated that he did not question trial counsel about the conflict of interests because he "didn't fully understand where he was going on it." The petitioner stated that, during his sentencing hearing, he was brought to the courthouse but "sat in the backroom" and was never brought into the courtroom.

The petitioner retained different counsel prior to his motion for new trial hearing. He said that his new counsel did not challenge the indictment and "withdrew . . . the ineffective assistance of counsel" claim from the motion for new trial.

Trial counsel testified that approximately one year passed between the petitioner's retaining him and the trial and that he met with the petitioner "[p]robably about ten" times during that period. Trial counsel said that he met with the petitioner at the petitioner's house "at least three times," and he visited the scene "at least twice." Trial counsel described his pretrial investigation, "I went to the scene. I think there was a four-wheeler involved in this—had the four-wheeler, talked with [the petitioner], interviewed the witnesses other than the victim, except the victim testified at the preliminary hearing." He acknowledged that he did not conduct a background check on Ms. Hatfield or Ms. Henegar but stated that he had known Ms. Henegar "fairly well" for her whole life because she is the daughter of his first cousin. He stated that he was unaware of anything in Ms. Henegar's life that "could have been used to impeach her credibility." He interviewed the lead detective in the case. He stated that employing a private investigator in this case would not have been beneficial because the alleged incidents occurred eight to 10 years prior to the indictment. Although several witnesses were sworn for the defense at trial, he did not call any witnesses.[3]

Trial counsel conceded that, had he known that Ms. Hatfield believed the victim fabricated the story, he would have attempted to elicit that during cross-examination. He agreed that Ms. Hatfield's statements that the victim's allegations were "suspiciously similar" to her own rape and that she believed the victim had adopted Ms. Hatfield's story as her own would have been helpful to impeach the victim's testimony. He agreed that this case "was a he said, she said case" and that the State's case was based entirely on the credibility of the victim. He also agreed that having a State witness impeach the victim's testimony would have been helpful to the petitioner's defense. He conceded that he was unaware of Ms. Hatfield's potential testimony because he did not interview her prior to trial.

Trial counsel testified that, at the time of the petitioner's trial, he employed co-counsel. He agreed that his office represented the petitioner and Ms. Henegar contemporaneously. Despite having never obtained a written waiver of the conflict of interests from the petitioner and having no recollection of explaining the conflict to the petitioner, trial counsel contended that the petitioner "made an intelligent and voluntary waiver" of the conflict.

Trial counsel did not recall receiving any plea offers from the State but said that if he had received one, he would have communicated it to the petitioner. Trial counsel testified that he discussed with the petitioner the risks of going to trial and

---

[3] The record actually shows that Petitioner's trial counsel called the victim's sister, Paige Smith, as a witness for the defense [Doc. 11-3, at 8–15].

explained that, if convicted, the petitioner would be required to serve 100 percent of his sentence. Trial counsel agreed that the petitioner was "a very credible person" and said that if he "made a mistake in representing [the petitioner] in this trial, . . . it was his not testifying." He admitted that the petitioner made the decision not to testify based upon counsel's advice that he not do so, but he said that, in hindsight, he "should have insisted that [the petitioner] testify." Counsel stated that, "[a]t the time, the decision seemed right" because counsel believed that the victim "had jeopardized herself [and] the State's case in her testimony" because she had made "several inconsistent statements." . . .

During cross-examination, trial counsel testified that his pretrial preparation in this case was adequate and that he was fully prepared for trial. He testified that, although he interviewed Detective Hall, he did not ordinarily conduct background checks on law enforcement officers. Although it was trial counsel's practice to tell clients to not worry about their cases, he never promised favorable results. When asked whether the decision to not cross-examine Ms. Hatfield was a strategic one, he replied, "I'm sure that it was." He asserted that, at the time of trial, he did not know that Ms. Hatfield doubted the victim's allegations. Trial counsel testified that he discussed with the petitioner whether the petitioner should testify, and it was the petitioner's decision to not testify. Trial counsel stated that the petitioner "received very effective representation of counsel."

At the conclusion of the hearing, the post-conviction court denied relief, finding that the petitioner had failed to prove by clear and convincing evidence sufficient facts to support a finding that he was deprived of the effective assistance of counsel.

Specifically, the court found that a conflict of interests existed due to trial counsel and co-counsel's contemporaneous representation of the petitioner and Ms. Henegar and that the conflict "was not perfectly disclosed and it was not perfectly perfected, but that rises to the level of an ethical concern not a prejudicial one." The post-conviction court found that the petitioner was not prejudiced by the conflict of interests because the petitioner presented no evidence of anything that either attorney could have used to "question Ms. Henegar's testimony or reliability." The post-conviction court also found that there was "no showing that there was some major objection [by the petitioner to] co-counsel's . . . presence" at trial or that co-counsel's assisting in the trial "was of some problem." The post-conviction court denied relief on this issue.

The post-conviction court found that, although co-counsel "had very little, if any[thing], to do with the trial preparation[,] . . . there is no showing that . . . had [he] done more that the outcome would be different." The post-conviction court found that the petitioner failed to show prejudice on this issue. The court did not specifically address the adequacy of trial counsel's trial preparation.

The post-conviction court found that the petitioner's credibility was damaged by his statements that the trial court asked before trial whether he would testify and that he was not present during sentencing. The court noted that, contrary to trial counsel and co-counsel's stating that they did not know or did not remember something, the petitioner "answered in ways that simply were incredible or lack[ed] . . . the product of memory." The court accredited trial counsel and co-counsel's testimony over that of the petitioner's and denied post-conviction relief.

*Wilson v. State*, No. E2018-00299-CCA-R3-PC, 2019 WL 1513833, at *1–5 (Tenn. Crim. App. April 8, 2019), *perm. app. denied* (Tenn. Aug. 14, 2019) ("*Wilson II*"). The TCCA affirmed the denial of the post-conviction petition, and the TSC denied review [Doc. 11-25]. *See id.*

Petitioner next filed the instant § 2254 petition asserting the following claims for ineffective assistance of counsel:

1. Trial counsel failed to properly investigate his case prior to trial, including failing to interview Melia Henegar and Tiffany Hatfield prior to trial;

2. Trial counsel failed to cross-examine Ms. Hatfield at trial;

3. Trial counsel failed to present Ms. Henegar as a witness at trial;

4. Trial counsel admitted to having a conflict of interest due to concurrent representation of Ms. Henegar and Petitioner and had a conflict of interest because Ms. Henegar is the daughter of trial counsel's first cousin;

5. Trial counsel's cross-examination of Detective Jami Hall was ineffective;

6. Trial counsel failed to call Petitioner to testify;

7. Trial counsel failed to call Judy Wilson and Raymond Smith to testify regarding the timeline of the second offense and the victim's credibility;

8. Trial counsel only attempted to interview one witness despite the indictment listing multiple prosecution witnesses; and

9. Prior to the post-conviction hearing, trial counsel was under investigation for unethical and illegal activity.

[Doc. 1, at 4, 12, 18–24].

In his response to this petition, Respondent contends that Petitioner's only exhausted claims are that: (1) trial counsel was ineffective for failing to investigate the case prior to trial; and (2) trial counsel was ineffective for failing to interview or cross-examine Tiffany Hatfield [Doc. 12, at 16–21]. Respondent further contends in his response that the remainder of Petitioner's claims arise out of allegations that his trial counsel was ineffective for not using other witnesses to point out inconsistencies in the victim's various statements, but these claims are procedurally defaulted and barred from this Court's review [*Id.* at 21–24].

In his reply, Petitioner asserts both that: (1) he has maintained his actual innocence throughout his criminal proceedings; and (2) he raised the claims Respondent categorizes as unexhausted in his post-conviction petition [Doc. 13, at 2]. Petitioner then alleges that the state courts incorrectly applied a prejudice requirement to his concurrent-representation conflict-of-interest claim [*Id.* at 6–7] and sets forth allegations to support both his conflict-of-interest ineffective-assistance-of-counsel claims and some of his other claims [*Id.* at 7–10, 11–14].

Petitioner then filed a motion for an evidentiary hearing [Doc. 14], to which Respondent filed a response in opposition [Doc. 17], and a motion to file documents in the record [Doc. 19]. While the Court denied these motions [Doc. 20], Petitioner filed the documents he sought to add to the record when he filed his motion to file documents in the record [Doc. 19, at 5–11].

Respondent construed Petitioner's reply to raise new claims, and he therefore sought and received permission to file a sur-reply [Docs. 15, 16, 20]. In his sur-reply, Respondent argues that Petitioner cannot raise new claims for relief in a reply [Doc. 21, at 6]. Respondent further argues that Petitioner procedurally defaulted his concurrent-representation conflict-of-interest claim and has not set forth sufficient cause to excuse this procedural default [*Id.* at 7–8]. Respondent also asserts that Petitioner procedurally defaulted his claim that his counsel was

13

ineffective for not calling Judy Wilson and Raymond Smith to testify, pointing out that this claim was not in the amended post-conviction petition, the post-conviction court did not rule on it, and Petitioner did not include it in his appeal [*Id.* at 8–9].

Petitioner then filed a sur-sur-reply blaming his counsel for his default of any claims and asserting, among other things, that he (1) brought his claim regarding counsel not calling Judy Wilson and Raymond Smith as witnesses through post-conviction hearing testimony and in his cumulative error claim on appeal and (2) raised his conflict-of-interest claim in his amended petition for post-conviction relief and at the post-conviction hearing [Doc. 22, at 1–5]. Petitioner also sets out a claim that he is actually innocent in his sur-sur-reply [*Id.* at 5] and later filed two affidavits to support this claim [Docs. 25, 27].

## II.    STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") allows a federal court to grant habeas corpus relief on any claim adjudicated on the merits in a state court only where that adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established" United States Supreme Court precedent; or (2) "resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented." *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

This Court may grant habeas corpus relief under the "contrary to" clause where the state court (1) "arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law; or (2) decide[d] a case differently than the Supreme Court on a set of materially indistinguishable facts." *See Williams v. Taylor*, 529 U.S. 362, 405 (2000). The Court may grant habeas corpus relief under the "unreasonable application" clause where the state court applied the correct legal principle to the facts in an unreasonable manner. *Id.* at 407.

14

But even an incorrect state-court decision is not necessarily unreasonable. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold") (citing *Williams*, 529 U.S. at 410). Rather, this Court may grant relief for a claim decided on its merits in state court only where the state-court ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Also, before a federal court may grant habeas corpus relief, the petitioner must have first exhausted his available state remedies by "fairly present[ing]" each federal claim to all levels of the state appellate system to ensure that states have a "full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990) (citing *Justices v. Boston Mun. Court v. Lydon*, 466 U.S. 294, 302–03 (1984)). In Tennessee, presentation of a claim to the TCCA is sufficient. Tenn. S. Ct. R. 39.

If a petitioner never presented a claim to the highest available state court and a state procedural rule now bars presentation of the claim, the petitioner procedurally defaulted that claim. *Coleman v. Thompson*, 501 U.S. 722, 731–32, 750 (1991). Such a claim is technically exhausted but procedurally defaulted. *Gray v. Netherland*, 518 U.S. 2074, 2080 (1996); *Coleman*, 501 U.S. at 732; *Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted"). Tennessee petitioners may generally proceed only through one full round of the post-conviction process, and Tennessee imposes a one-year statute of limitation on such actions. Tenn. Code Ann. § 40-30-102(a) (one-year limitation period), § 40-30-102(c) ("one petition" rule).

15

On federal habeas review, the district court may review a procedurally defaulted claim only where the prisoner can show cause for that default and actual resulting prejudice, "or . . . that failure to consider the claim[] will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 749–50. Actual innocence, if proved, also serves as a gateway through which a petitioner may obtain review of his otherwise barred or untimely claims of constitutional violation. *See McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); *see also Schlup v. Delo*, 513 U.S. 298 (1995); *House v. Bell*, 547 U.S. 518 (2006). In this context, "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (citation and internal quotation marks omitted). Invocation of this exception requires the claim of innocence to be credible. *Cleveland v. Bradshaw*, 693 F.3d 626, 631 (6th Cir. 2012) (citing *Souter v. Jones*, 395 F.3d 577, 601 (6th Cir. 2005)). To be credible, a claim of actual innocence must be supported "with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324.

Errors of post-conviction counsel generally cannot serve as "cause" to excuse a procedural default. *Coleman*, 501 U.S. at 753–53. But the Supreme Court established an equitable exception to this rule in *Martinez v. Ryan*, holding that the inadequate assistance of post-conviction counsel or the absence of such counsel may establish cause for a prisoner's procedural default of an ineffective assistance of trial counsel claim under certain circumstances. 566 U.S. 1, 9, 17 (2012). The *Martinez* exception

> allow[s] a federal habeas court to find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim;" and (4) state law requires

16

that an "ineffective assistance of trial counsel [claim] be . . . raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 13–14, 16–17). This exception applies in Tennessee. *Sutton v. Carpenter*, 745 F.3d 787, 792–95 (6th Cir. 2014).

An ineffective-assistance-of-counsel claim is substantial where it "has some merit and is debatable among jurists of reason." *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 713 (6th Cir. 2015) (citing *Martinez*, 566 U.S. at 14). Conversely, "a claim is insubstantial when 'it does not have any merit,' 'is wholly without factual support,' or when 'the attorney in the initial-review collateral proceeding did not perform below constitutional standards.'" *Porter v. Genovese*, 676 F. App'x 428, 432 (6th Cir. 2017) (quoting *Martinez*, 566 U.S. at 15–16).

The *Martinez* exception does not apply to a claim of ineffective assistance of trial counsel that a petitioner raised in the initial-review collateral stages and defaulted on appeal. *See*, *e.g.*, *Middlebrooks v. Carpenter*, 843 F.3d 1127, 1136 (6th Cir. 2016) (stating that *Martinez* did not apply "because those claims were raised and rejected on the merits by the initial postconviction court, and ineffective assistance of counsel on post-conviction appeal cannot establish 'cause' to excuse [petitioner]'s procedural default, which occurred only in the Tennessee Court of Criminal Appeals"). And *Martinez* does not excuse a petitioner's failure to develop a factual record for a claim, even where he attributes that failure to the ineffective assistance of his post-conviction counsel. *Shinn v. Ramirez*, No. 20-1009, __ S. Ct. __, 2022 WL 1611786, at *9 (May 23, 2022).

## III.    ANALYSIS

As the Court noted above, Respondent asserts that Petitioner procedurally defaulted many of his claims. However, Petitioner claims that his actual innocence and/or the ineffective assistance of his post-conviction counsel excuse any such default.

### A.    Actual Innocence

As the Court noted above, Petitioner argues in his reply that he has always asserted his actual innocence [Doc. 13, at 2], asserts a claim for actual innocence in his sur-sur-reply [Doc. 22], and filed two affidavits to support his actual-innocence claim [Doc. 25, at 3; Doc. 27, at 4]. However, Petitioner did not assert a claim for actual innocence in his § 2254 petition [Doc. 1] and has not sought to amend his petition to assert such a claim.  Even if the Court were to allow Petitioner to bring his actual-innocence claim in this manner, Petitioner has not established that he is entitled to relief under § 2254 or review of defaulted claims based on his actual innocence.

Petitioner asserts in his sur-sur-reply that he is actually innocent because his "convictions rest solely on the uncorroborated, sketchy, incredible testimony of a family relative of [P]etitioner's wife" [Doc. 22, at 5].  Petitioner also filed two motions for the Court to consider affidavits to support this claim [Docs. 25, 27] and indicates in both motions that his innocence allows the Court to consider his procedurally defaulted claims [Doc. 25, at 1; Doc. 27, at 1].  The first affidavit is from Paige Smith, the victim's sister, and her affidavit generally provides that the victim and her mother lied to the court, Petitioner is innocent and was good to Ms. Smith's family, and the victim was never around Petitioner by herself [Doc. 25, at 2].  The second affidavit is from Lisa Smith, who testifies, in relevant part, that she has known Petitioner for about thirty-five years, he is like a dad to her, and he is a good person who is innocent [*Id.* at 4].  Additionally, as the Court noted above, Petitioner filed two affidavits from Judy Wilson and Raymond Smith to support his claim that his counsel was ineffective for not calling these witnesses at trial, and both Judy Wilson and Raymond Smith opine that Petitioner is innocent in their affidavits [Doc. 19, at 9–11].

18

To the extent Petitioner seeks relief based on a stand-alone claim for actual innocence, that claim is not cognizable in this action. *Herrera v. Collins*, 506 U.S. 390, 400 (1993) (holding that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding"). Actual innocence is a gateway through which a petitioner may obtain review of procedurally barred habeas corpus claims. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). But this exception requires a credible claim of innocence. *Cleveland v. Bradshaw*, 693 F.3d 626, 631 (6th Cir. 2012) (citing *Souter v. Jones*, 395 F.3d 577, 601 (6th Cir. 2005)). Thus, such a claim requires "new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

None of the affidavits Petitioner has filed in this action contains a new, reliable, trustworthy eyewitness account that establishes Petitioner's actual innocence. The closest any of these affidavits comes to asserting personal knowledge of Petitioner's actual innocence is Paige Smith's allegation that the victim was never alone around Petitioner [Doc. 25, at 2]. But Ms. Smith presented substantively identical testimony at Petitioner's trial [Doc. 11-3, at 11–12]. Thus, this testimony is not new, and the jury clearly did not credit it. Accordingly, Petitioner has not established that he is entitled to review of any of his defaulted claims, or to relief under § 2254, based on his actual innocence.

## A. Ineffective Assistance of Counsel

### i. Standard of Review

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const.

amend. VI. This includes the right to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims for ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687. A petitioner has the burden of proving that his counsel provided ineffective assistance. *Virgin Islands v. Nicholas*, 759 F.2d 1073, 1081 (3d Cir. 1985).

In considering the first prong of *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A party asserting an ineffective-assistance-of-counsel claim must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). The second prong of the *Strickland* test requires a claimant to show counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. The Supreme Court has emphasized that a claimant must establish both prongs of a claim for ineffective assistance of counsel to meet her burden, and if either prong is not satisfied, the claim must be rejected. *Id.* at 69. Moreover, a habeas petitioner alleging ineffective assistance of

counsel bears a heavy burden, given the "doubly deferential" review of a such a claim under § 2254(d)(1).  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

### ii.        Failure to Investigate, Failure to Cross-Examine Ms. Hatfield, and Failure to Present Ms. Henegar as a Witness

In several related claims, Petitioner claims that trial counsel was ineffective for:  (1) failing to adequately investigate his case prior to trial, including specifically failing to interview Ms. Henegar and Ms. Hatfield; (2) failing to present Ms. Henegar as a witness; and (3) failing to cross-examine Ms. Hatfield [Doc. 1, at 18–21].  Petitioner presented ineffective-assistance-of-counsel claims asserting that his counsel failed to adequately investigate the case, including failing to interview witnesses, and failed to cross-examine Ms. Hatfield to the TCCA in his appeal of the denial of his petition for post-conviction relief [Doc. 11-19, at 19–23], and the TCCA addressed them as follows:

> We note that the post-conviction court addressed only the petitioner's claim that co-counsel failed to perform an adequate pretrial investigation, finding that co-counsel was not deficient because he had only minimal involvement in the case.  Although the court made no specific finding as to the adequacy of counsel's investigation, the post-conviction court accredited trial counsel's testimony that he visited the scene at least twice, investigated the four-wheeler, talked with the petitioner, interviewed some witnesses, and cross-examined the victim at the preliminary hearing.  Most importantly, however, the petitioner failed to present at the evidentiary hearing any evidence that counsel could have uncovered with further investigation.  Generally, a petitioner fails to establish his claim that counsel did not properly investigate or call a witness if he does not present the witness or evidence to the post-conviction court because a post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial.  *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).
>
> The petitioner also claims that trial counsel performed deficiently by failing to interview the victim prior to trial.  Although trial counsel did not interview the victim prior to trial, he did cross-examine her at the preliminary hearing.  The petitioner did not present the victim as a witness at the evidentiary hearing; indeed, the petitioner failed to establish that the victim would have agreed to be interviewed prior to trial.  Under these circumstances, any conclusion that a pretrial interview would have uncovered information different from that offered

by the victim at the preliminary hearing and favorable to the petitioner would be based upon speculation. In consequence, the petitioner has failed to establish that counsel performed deficiently by failing to interview the victim prior to trial.

The petitioner next contends that trial counsel performed deficiently by failing to interview Ms. Hatfield, arguing that, had he done so, he would have learned that Ms. Hatfield doubted the veracity of the victim's claims. In a related claim, the petitioner asserts that trial counsel's performance was deficient because he failed to cross-examine Ms. Hatfield at trial.

The record establishes that, prior to filing his motion for new trial, the petitioner fired trial counsel and hired a new attorney to represent him. That attorney obtained from Ms. Hatfield an affidavit in which Ms. Hatfield expressed doubt about the veracity of the victim's allegations against the petitioner, noting that the victim's allegations were "suspiciously similar" to the details of abuse that Ms. Hatfield had previously revealed to the victim, leading Ms. Hatfield to suspect that the victim had taken Ms. Hatfield's revelation of abuse "and made it her own." Ms. Hatfield also observed that the victim "never appeared frightened or anxious around" the petitioner following the alleged rapes and that Ms. Hatfield, herself a victim of sexual abuse, "never felt uncomfortable around" the petitioner. Although the petitioner exhibited Ms. Hatfield's affidavit to his original pro se petition for post-conviction relief, he did not present it for admission into evidence at the evidentiary hearing. Additionally, although the entire trial record was made an exhibit at the evidentiary hearing, Ms. Hatfield's affidavit was never entered into evidence during any trial proceeding.

That being said, Ms. Hatfield did testify at the motion for new trial hearing, and the transcript of that hearing was admitted as an exhibit at the evidentiary hearing. During her testimony, Ms. Hatfield did not deny making the statements in her affidavit but qualified some of them. Ms. Hatfield testified that she was "a little bit suspicious" when the victim told her about being raped by the petitioner. When asked about her affidavit statement that she believed the victim had adopted Ms. Hatfield's story as her own, Ms. Hatfield responded, "I had thoughts of that, yes, but it was just due to problems in our relationship that occurred after the trial." Ms. Hatfield maintained "that she did not have any personal knowledge that the victim had lied about her encounters with the" petitioner. The trial court deemed Ms. Hatfield's testimony "largely speculative regarding the victim's basis of testimony and lack of behavior indicating sexual abuse." *Bill Shannon Wilson*, slip op. at 8. The court also concluded that "[s]uch information, without more, would be inadmissible at trial." *Id.*

To be sure, trial counsel should have at least attempted to interview Ms. Hatfield prior to the petitioner's trial. That being said, the petitioner has failed to establish that he was prejudiced by counsel's omission. Although the fact that Ms. Hatfield had doubts about the veracity of the victim's claims could have been potentially damaging to the victim's credibility, the trial court, who was able to see and hear

22

the witness first hand, found Ms. Hatfield's own credibility to be lacking. Moreover, the trial court, even with the benefit of Ms. Hatfield's live, sworn testimony, concluded that the potential impact of that testimony was not so great as to afford the petitioner a new trial. This court affirmed the trial court's ruling on direct appeal, deferring to the trial court's credibility determination and finding that the trial court did not abuse its discretion by refusing to grant a new trial based upon testimony provided by Ms. Hatfield and a second witness, particularly given that "[a]t the hearing, both of these witnesses denied portions of the affidavits submitted in support of the [petitioner's] claim, discounting what little, if any, basis existed to support a finding that the victim's trial testimony was false." *Id.*, slip op. at 9.

Because Ms. Hatfield did not testify at the evidentiary hearing, we have no basis upon which to revisit the earlier determination that her testimony lacked credibility. Moreover, in the absence of her testimony at the evidentiary hearing, we must presume that she would have revealed to trial counsel no more than she revealed at the hearing on the motion for new trial. Under these circumstances, we cannot say that it is reasonably probable that, had counsel interviewed Ms. Hatfield prior to trial, the result of the proceeding would have been different. Consequently, the petitioner is not entitled to relief on this issue.

*Wilson II*, at *6–8.

While Petitioner did not assert a claim regarding his trial counsel's failure to present Ms. Henegar as a witness at trial in either of his post-conviction petitions [Doc. 11-15, at 3–46, 83–89] or in his appeal to the TCCA [Doc. 11-19], the Court construes Petitioner's filings in this case to assert that the ineffective assistance of his post-conviction counsel excuses that procedural default, such that the Court can review the claim under the *Martinez* exception.

First, Petitioner has not established that the TCCA's denial of his claim regarding trial counsel's failure to investigate was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented, nor does the record reflect as much. In support of this claim, Petitioner notes in his petition that only the victim's testimony, which he classifies as "riddled with inconsistencies," supported his convictions, trial counsel only interviewed one of the individuals listed as a witness for the prosecution but did not interview Ms. Hatfield or Ms. Henegar, and trial counsel Gray was not involved in pretrial

23

preparation [Doc. 1, at 18–19, 24]. However, the record supports the TCCA's findings that Petitioner's trial counsel did prepare for the trial and interview at least some witnesses, even if he did not "customarily" take notes as to those interviews [Doc. 11-17, at 79–87]. Additionally, while Petitioner correctly points out that the victim's credibility was the lynchpin of the prosecution's case against him, the record establishes that Petitioner's counsel thoroughly cross-examined the victim regarding the inconsistencies in her testimony at trial [Doc. 11-2, at 84–106] and emphasized those inconsistencies in his closing statement [Doc. 11-3, at 50–56]. Moreover, while Petitioner alleges that his trial counsel should have interviewed Ms. Henegar and Ms. Hatfield prior to trial, should have cross-examined Ms. Hatfield, and should have presented Ms. Henegar as a witness, he has not established a reasonable probability that counsel's failure to do these things prejudiced him.

> a.     Ms. Henegar

First, as to Petitioner's claim that trial counsel failed to interview Ms. Henegar before trial, Petitioner does not identify what information trial counsel could have uncovered in such an interview. But he does allege that at trial, Ms. Henegar could have provided information regarding: (1) the victim's timeline of the offenses, as notes from her interview with the victim stated the offense occurred in 2005 [Doc. 1, at 32, 34]; and (2) the state's failure to interview Paige Smith [*Id.* at 19–20].

However, as to the victim's timeline of the offenses, Detective Jami Hall, who interviewed the victim with Ms. Henegar, testified at Petitioner's trial that the relevant notes from the victim's interview with Ms. Henegar and Detective Hall indicate that the rapes occurred in 2005 instead of 2006 because the victim told them that the incidents occurred when she was eleven, and Detective Hall mistakenly wrote down 2005 due to her own confusion about what

24

year it would have been when the victim was eleven during the relevant time of year [Doc. 11-2, 129–30].  Nothing in the record indicates that Ms. Henegar would have provided any different information on this issue prior to or during Petitioner's trial.  And, even if the Court assumes that Ms. Henegar would have indicated that the victim stated that the rapes occurred in 2005 if trial counsel had interviewed her prior to trial and/or called her as a witness at trial, Petitioner's trial counsel thoroughly questioned the victim about the inconsistencies in her statements about the rape incidents, including the timeline of those incidents and the related events, in cross-examining her [*id.* at 84–106] and emphasized those inconsistencies in his closing statement [Doc. 11-3, at 50–56].  Nothing in the record indicates that more evidence about these inconsistencies had a reasonable probability of changing the result of the trial.

Further, nothing in the record suggests a reasonable probability that any information regarding Detective Hall's failure to interview Paige Smith prior to Petitioner's trial would have changed the outcome of Petitioner's trial.  Paige Smith testified at trial in Petitioner's defense [Doc. 11-3, at 8–15], and it is apparent that the jury did not credit her testimony.

    b.    Ms. Hatfield

As to Ms. Hatfield, Petitioner alleges that if counsel had interviewed this witness prior to trial, he would have discovered that Ms. Hatfield suspected the victim was lying about the rape allegations and had adopted Ms. Hatfield's rape story as her own, such that Petitioner's trial counsel could have elicited such testimony on cross-examination [Doc. 1, at 21; *see also* Doc. 11-15, at 34–36].  Petitioner also notes that, at the post-conviction hearing, his trial counsel acknowledged that he would have attempted to use some information from Ms. Hatfield's affidavit that Petitioner filed in support of his motion for new trial and testimony at the motion

for new trial hearing when he cross-examined her at trial, if he had discovered that information prior to trial [Doc. 1, at 21; Doc. 11-15, at 93–94, 117].

But as the TCCA noted, Petitioner did not present Ms. Hatfield as a witness at the post-conviction hearing [*See generally* Doc. 11-15]. And, while Ms. Hatfield testified at the hearing on the motion for new trial, the trial court specifically found that most of the testimony offered at that hearing was "very incredible," that the victim's trial testimony was more credible than any of the testimony from that hearing, and that Petitioner would not "get a lot of . . . leverage" from the testimony at that hearing [Doc. 11-1, at 149–50]. The trial court also pointed out that much of Ms. Hatfield's testimony at that hearing was speculation that would have been inadmissible at trial [*Id.* at 149], and the record supports that finding [Doc. 11-6, at 19–35].

In Ms. Hatfield's affidavit accompanying the motion for new trial, she suggests that she never believed the rape allegations and never felt that Petitioner was a sexual predator [Doc. 11-15, at 34–36]. But the TCCA accurately noted that while Ms. Hatfield did not completely recant her affidavit testimony in her testimony at the motion for new trial hearing, she certainly qualified it. For example, Ms. Hatfield testified at the motion for new trial hearing that she: (1) would be suspicious of anyone who made sexual-abuse allegations like those the victim made; (2) doubted the victim's story about Petitioner raping her due to problems in her relationship with the victim; (3) had never been around Petitioner alone; (4) did not have the ability to identify sexual predators just by being around them; and (5) did not have any personal knowledge that the victim had lied about anything [*See, e.g.*, Doc. 11-6, at 24, 26, 32–33].

Thus, as Ms. Hatfield never expressed personal knowledge that the victim was lying about the rape allegations, the record does not support finding that Petitioner's trial counsel would have been successful in introducing testimony regarding her speculation that the victim

26

was lying. *See* Tenn. R. Evid. 602 ("a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter"). And, as the trial court specifically found that the testimony offered at the motion for new trial hearing was less credible than the victim's trial testimony, this Court, like the TCCA, cannot find a reasonable probability that the successful introduction of such evidence would have made a difference in the result of Petitioner's trial. As such, Petitioner has not established that his trial counsel's failure to interview Ms. Henegar and Ms. Hatfield, cross-examine Ms. Hatfield, or present Ms. Henegar as a witness prejudiced him. Thus, he is not entitled to relief under § 2254 for these claims.

### iii. *Conflicts of Interest*

Petitioner next asserts that trial counsel was ineffective for having a conflict of interest because, at the time of Petitioner's trial, his trial counsel also represented Ms. Henegar in a divorce [Doc. 1, at 19]. However, Respondent correctly points out that Petitioner raised this claim in his amended petition for post-conviction relief [Doc. 11-15, at 88] but did not raise it in his appeal of the denial of that petition to the TCCA [Doc. 11-19]. Accordingly, Petitioner procedurally defaulted this claim. And, while Petitioner seeks to blame his counsel for this default, *Martinez* does not excuse a procedural default by post-conviction counsel on appeal. *Middlebrooks v. Carpenter*, 843 F.3d 1127, 1136 (6th Cir. 2016). Thus, Petitioner is not entitled to relief under § 2254 for this claim, and the Court will not address it on the merits.

In his filings, Petitioner also repeatedly refers to a conflict of interest because Ms. Henegar was the daughter of Petitioner's counsel's first cousin [Doc. 1, at 14; Doc. 13, at 4]. While Petitioner's counsel admitted to this familial relationship at the post-conviction hearing [Doc. 11-17, at 83–84], Petitioner did not raise a conflict-of-interest claim under this theory to

the state courts in either of his post-conviction petitions [Doc. 11-15, at 3–46, 83–89] or in his appeal to the TCCA [Doc. 11-19], and he cannot do so now. To the extent Petitioner seeks relief on this ground under *Martinez* based on his post-conviction counsel's failure to raise the claim, any such claim is not substantial and therefore does not entitle him to relief under § 2254.

First, while Petitioner insists that he is entitled to a presumption of prejudice for this claim under *Cuyler v. Sullivan*, 446 U.S. 335 (1980), that is incorrect. Under *Cuyler*, a district court presumes prejudice where the defendant establishes that his lawyer "actively represented conflicting interests" and this "actual conflict of interest adversely affected his lawyer's performance." *Id.* at 345–50. But the Supreme Court has confined this presumption of prejudice to multiple concurrent representation of criminal defendants. *Mickens v. Taylor*, 535 U.S. 162, 166–73 (2002). And the Sixth Circuit has therefore found that the *Strickland* standard applies in all other conflict-of-interest cases. *Leonard v. Warden*, 846 F.3d 832, 844 (6th Cir. 2017) (citing *Stewart v. Wolfenbarger*, 468 F.3d 338, 350–351 (6th Cir. 2006)).

Petitioner has not established that this familial relationship between his counsel and Ms. Henegar prejudiced him, as he must do under *Strickland*. Specifically, Petitioner has never set forth proof, other than his own speculative assertions, that the fact that Ms. Henegar was the daughter of his counsel's first cousin had any effect on his counsel's actions. Even if the Court assumes that this familial relationship kept counsel from interviewing Ms. Henegar prior to trial and/or calling Ms. Henegar as a witness and that Ms. Henegar would have testified that the victim told Ms. Henegar and Detective Hall that the rape incidents occurred in 2005, as set forth above, trial counsel thoroughly impeached the victim about the inconsistencies in her statements about the rape incidents, including the timeline of those incidents and related events, in cross-examining her [Doc. 11-2, at 84–106] and emphasized those inconsistencies in his closing

statement [Doc. 11-3, at 50–56]. Again, nothing in the record indicates that more evidence about these inconsistencies had a reasonable probability of changing the result of Petitioner's trial. Accordingly, Petitioner also is not entitled to relief under § 2254 for this conflict-of-interest claim.

### iv. *Detective Jami Hall Cross-Examination*

Petitioner also claims that his counsel was ineffective with regard to the cross-examination of Detective Jami Hall because he "failed to elicit testimony relating to the event the victim described as the second offense" and that an effective cross-examination would have shown that Detective Hall did not interview anyone to establish a date on which Raymond Smith had visited Murfreesboro for a visit that required the victim to visit Petitioner's home, as the victim testified [Doc. 1, at 21–22]. While Petitioner raised the issue of the inconsistency between what the victim told Detective Hall in her interview with the victim and her testimony at trial in his motion for new trial as part of his attack on the sufficiency of the evidence [Doc. 11-1, at 47–48], he did not raise this claim under an ineffective-assistance-of-counsel theory to the state courts in his direct appeal of his convictions [Doc. 11-8], either of his post-conviction petitions [Doc. 11-15, at 3–46, 83–89], or in his post-conviction appeal to the TCCA [Doc. 11-19], and he cannot do so now. Thus, Petitioner procedurally defaulted this claim. While Petitioner asserts that this procedural default was the result of the ineffective assistance of his post-conviction counsel such that the Court can consider it under *Martinez*, he has not established that this claim is material. Specifically, the record does not support the assertion that any additional testimony from Detective Hall regarding the second offense event had a reasonable probability of changing the result of Petitioner's trial. The record establishes that the victim originally told Detective Hall that she was traveling to Petitioner's house with him at the

29

time of the second incident due to Petitioner's wife having a hysterectomy [Doc. 1, at 32, 38] yet testified at trial that she was traveling with Petitioner due to her grandfather having an appointment in Murfreesboro [Doc. 11-2, at 71]. But Petitioner's counsel cross-examined both the victim and Detective Hall regarding this inconsistency in the victim's accounts [*Id.* at 100–02, 39] and emphasized this inconsistency in his closing statement [Doc. 11-3, at 53]. Petitioner has not shown that Detective Hall knew the victim would testify at trial that the second incident occurred due to her grandfather having an appointment in Murfreesboro, such that evidence of her failure to interview anyone about this event would have been relevant at his trial. Thus, Petitioner is not entitled to relief under § 2254 for this claim.

### v. *Petitioner's Testimony*

Petitioner next claims that his trial counsel was ineffective for advising him not to testify at trial because trial counsel admitted at the post-conviction hearing that Petitioner would have made a credible witness and told the jury that Petitioner was going to testify [Doc. 1, at 22]. Petitioner raised this claim in his pro se petition for post-conviction relief [Doc. 11-15, at 18–20], but his post-conviction counsel did not explicitly incorporate the claim into the amended petition for post-conviction relief [*Id.* at 83–89], even though post-conviction counsel asked Petitioner's trial counsel about his decision to advise Petitioner not to testify at the post-conviction hearing [Doc. 11-17, at 103–04]. But, as the post-conviction court's order denying the post-conviction petition specified that it heard the case based on both the original petition for post-conviction and the amendments thereto, as well as the state's responsive pleadings, and found no merit to any of Petitioner's claims [Doc. 11-15, at 97], it again appears that this claim is barred from this Court's consideration due to Petitioner's default of this claim in his appeal of the denial of his post-conviction petition. *Middlebrooks v. Carpenter*, 843 F.3d 1127, 1136 (6th Cir. 2016).

Even if the Court assumes that it can address this claim under *Martinez* due to Petitioner's post-conviction counsel failing to include or incorporate this claim in the amended post-conviction petition, this claim is not substantial, and Petitioner therefore is not entitled to § 2254 relief for this claim. Specifically, at the post-conviction hearing, Petitioner's trial counsel notably testified that (1) Petitioner was very credible and would have made a good witness,[4] and (2) trial counsel felt that, if he made a mistake at Petitioner's trial, it was not insisting that Petitioner testify [Doc. 11-17, at 103–04]. However, trial counsel also testified that (1) Petitioner was the one who made the decision not to testify after speaking with trial counsel, and (2) "[a]t the time, the decision [that Petitioner should not testify] seemed right" because trial counsel believed that the victim had jeopardized the prosecution's case through her inconsistent testimony [*Id.* at 103].

Thus, while it is apparent that Petitioner's trial counsel regretted his decision not to insist that Petitioner testify, it is also apparent that he did not do so due to his informed decision that Petitioner's testimony was not necessary. And this Court will not second guess this strategic decision under these circumstances. *See Strickland v. Washington*, 466 U.S. 668, 690–91 (1984) (noting that counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"); *Burton v. Renico*, 391 F.3d 764, 774 (6th Cir. 2004) (holding that "strategic choices by counsel, while not necessarily those a federal judge in hindsight might make, do not rise to the level of a Sixth Amendment violation"). Accordingly, Petitioner is not entitled to relief under § 2254 for this claim.

---

[4] Despite Petitioner's trial counsel vouching for Petitioner's credibility and ability to be a good witness, the post-conviction court specifically and repeatedly found that Petitioner's testimony at the post-conviction hearing lacked credibility [Doc. 11-17, at 134–35, 137].

### vi. *Judy Wilson and Raymond Smith*

Petitioner also claims that his trial counsel was ineffective for not calling Judy Wilson and Raymond Smith to testify at his trial [Doc. 1, at 22–23]. Again, however, Petitioner raised this claim in his pro se petition for post-conviction relief [Doc. 11-15, at 17–18], but his post-conviction counsel did not explicitly incorporate the claim into the amended petition for post-conviction relief [*Id.* at 83–89]. And the post-conviction court's order denying the post-conviction petition specified that it heard the case based on both the original petition for post-conviction and the amendments thereto, as well as the state's responsive pleadings, and found no merit to any of Petitioner's claims [*Id.* at 97]. Also, while Petitioner asserts that this claim was included in his cumulative-error claim in his appeal [Doc. 22, at 3], the record does not support this assertion [Doc. 11-19, at 23–27]. Thus, it appears that this claim is also barred from this Court's consideration due to Petitioner's default of this claim in his appeal of the denial of his post-conviction petition. *Middlebrooks*, 843 F.3d at 1136.

Even if the Court assumes that it could consider this claim under *Martinez* due to Petitioner's post-conviction counsel failing to include or incorporate the claim into the amended post-conviction petition, the claim is not substantial. In his petition, Petitioner asserts that Judy Wilson could have testified about the date of her hysterectomy at trial [Doc. 1, at 22–23]. Also, as set forth above, in this case, Petitioner filed both a motion seeking to expand the record and for an evidentiary hearing [Docs. 14, 19]. In support of his motion to expand the record, Petitioner filed a letter from the Department of Veterans Affairs, two affidavits from Raymond Smith, and one affidavit from Judy Wilson [Doc. 19, at 5–11], all of which relate to his claim that his trial counsel should have called Raymond Smith and Judy Wilson as witnesses in this

case, and which he asserts establish the need for an evidentiary hearing in this case [Doc. 14, at 1–2, Doc. 19, at 1–2[5]].

The letter from the Department of Veterans Affairs states that it has no record of appointment dates for Raymond Smith in 2005 and 2006 [Doc. 19, at 5–6]. Likewise, in his first affidavit, Raymond Smith testifies that he did not recall any incident between November 2005 and September of 2006 when the victim stayed with Petitioner so that her mother could take him to the Veteran Affairs Hospital in Murfreesboro, despite the victim's testimony that this was the reason for her presence with Petitioner at the time of the second incident [*Id.* at 7–8]. In his second affidavit, Raymond Smith states: (1) the victim's allegations are untrue, (2) he has known Petitioner for more than twenty years and knows Petitioner did not and would not rape the victim, and (3) "[he] has seen no signs that [the victim] has ever been raped [or sexually assaulted] by anyone" [*Id.* at 9]. He also opines that Petitioner is innocent and should get a new trial [*Id.*].

In her affidavit, Judy Wilson testifies in relevant part that: (1) she has known Petitioner for forty-one years and has been married to him for thirty-one years; (2) Petitioner's trial counsel did not fully investigate Petitioner's case or call witnesses for Petitioner, including "character witnesses that could have defended [Petitioner's] innocence"; and (3) Petitioner's trial counsel did not defend Petitioner [*Id.* at 10–11]. Ms. Wilson also states, among other things, that if she and other witnesses had been called, they would have shown the victim's story to be fiction, and that Petitioner "would never hurt anybody" and is innocent and wrongfully convicted [*Id.*].

---

[5] Petitioner also asserts that these motions support a claim for ineffective assistance of his post-conviction counsel [Doc. 14, at 1–2, Doc. 19, at 1–2]. But Petitioner did not bring such a claim [Doc. 1]. And even if he had, he was not entitled to effective assistance of post-conviction counsel. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). Thus, it appears to the Court that Petitioner makes this statement to assert that *Martinez* is applicable to this claim.

33

However, as to the evidence that Raymond Smith did not have an appointment with the Department of Veterans Affairs during the time of the second incident [Doc. 11-2, at 71], the victim did not specify in that testimony that her mother was taking him to an appointment with the Veterans Affairs Hospital [*Id.*]. Thus, while Petitioner and Mr. Smith appear to assume the victim's testimony referred to Mr. Smith having an appointment at the Veterans Affairs Hospital, the victim's testimony, on its face, does not support that assumption. As such, the information from the Department of Veterans Affairs and Raymond Smith regarding the lack of any Veterans Affairs appointments for Raymond Smith during the relevant time period does not contradict the victim's testimony. Additionally, as the Court has repeatedly noted, Petitioner's trial counsel thoroughly cross-examined the victim about the inconsistencies in her pretrial statement and her trial testimony about the two rape incidents and the events surrounding them [*Id.* at 84–106, 112] and emphasized those inconsistencies in his closing statement [Doc. 11-3, at 50–56]. The record does not suggest a reasonable probability that further cross-examination of the victim regarding additional inconsistencies would have changed the result of Petitioner's trial.

Further, while Judy Wilson and Raymond Smith both opine that Petitioner is innocent, it does not appear that this opinion testimony would have been admissible under Tennessee law. Specifically, under the Tennessee Rules of Evidence, "a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Tenn. R. Evid. 602. And opinion testimony from a lay witness is only admissible where it is "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). While such testimony may address an ultimate issue before the jury, Tenn. R. Evid. 704, this is permissible only where the jury could not draw its own conclusions on the

issue without the lay witness opinion testimony. *Blackburn v. Murphy,* 737 S.W.2d 529, 533 (Tenn. 1987).

Judy Wilson and Raymond Smith's affidavits do not provide facts from which the Court could determine that they base their opinions that Petitioner is innocent on personal knowledge that is rationally based on their perceptions, such that these opinions would be admissible under Tennessee law or helpful to a jury determining Petitioner's guilt or innocence. And the record does not suggest that admission of other testimony from Judy Wilson or Raymond Smith's affidavits would have had a reasonable probability of changing the result of Petitioner's trial.

Also, while Petitioner notes that Judy Wilson could have testified about the date of her hysterectomy at trial, his counsel cross-examined both the victim and Detective Hall regarding the inconsistency in the victim's stories regarding the hysterectomy [Doc. 11-2, at 100–02, 39] and emphasized this inconsistency in his closing statement [Doc. 11-3, at 53], and nothing in the record suggests that further evidence on this issue may have changed the result of the trial.

Thus, Petitioner has not established that his counsel was deficient in not calling Judy Wilson or Raymond Smith to testify or that this caused him prejudice, and he is not entitled to relief under § 2254 for this claim.

### vii. Trial Counsel Misconduct

Petitioner also notes that, prior to his post-conviction hearing, his trial counsel "was under investigation for unethical and illegal conduct that eventually resulted in a five (5) year suspension from the practice of law. The conduct involved character, integrity, and dishonesty. The Post-Conviction Court still found Attorney Hatmaker to be a more credible witness than petitioner" [Doc. 1, at 24]. Petitioner attached documents to his petition regarding this suspension [*Id.* at 25–27].

35

To the extent Petitioner asks this Court to second-guess the post-conviction court's determination that his counsel was more credible than him at the post-conviction hearing, the Court declines to do so. *See Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) (noting that the reviewing court "is not as well positioned as the trial court is to make credibility determinations"). Also, Petitioner did not exhaust any claim related to this conduct or suspension with the state courts, nor does he connect his trial counsel's misconduct or suspension to his trial counsel's assistance to him at trial. As such, to the extent that Petitioner sought relief under § 2254 based on his trial counsel's misconduct, Petitioner is not entitled to relief under § 2254 for this claim.

## II.    CONCLUSION

For the reasons set forth above, the petition for § 2254 relief will be **DENIED**, and this action will be **DISMISSED**.

The Court must now consider whether to issue a certificate of appealability ("COA") should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas corpus proceeding only if he is issued a COA, and a COA may issue only where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a

constitutional right and thus a COA should issue. *See Miller-El*, 537 U.S. at 327, 336; *Slack*, 529 U.S. at 484.

Reasonable jurists would not debate the Court's finding that Petitioner procedurally defaulted his unexhausted ineffective assistance of counsel claims, and that those claims subject to *Martinez* analysis are not material. Further, reasonable jurists could not conclude that Petitioner has made a substantial showing of a denial of a constitutional right with regard to his actual innocence claim or his exhausted ineffective assistance of counsel claims, such that they would be adequate to deserve further review. Accordingly, a certificate of appealability **SHALL NOT ISSUE.** Also, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. Fed. R. App. P. 24.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

*/s/ Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**